UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Loretta-Azuka: Obi,
	Plaintiff

	v.	Case No. 18-cv-550-SM
	Opinion No. 2019 DNH 087
Exeter Health Resources, Inc.;
Core Physicians LLC; and
Barton & Associates, Inc.,
	Defendants

**O R D E R**

Pro se plaintiff, Dr. Loretta-Azuka: Obi, MD, brings this action against three corporate defendants, advancing state common law claims for breach of contract, intentional (tortious) interference with contractual relations, and defamation. She invokes this court's diversity subject matter jurisdiction, see 28 U.S.C. § 1332, and seeks $15 million in damages. Defendants move for summary judgment, asserting that there are no genuinely disputed material facts and claiming they are entitled to judgment as a matter of law on each of Dr. Obi's claims. Dr. Obi objects.

For the reasons discussed, defendants' motions for summary judgment are granted.

**Standard of Review**

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted). Consequently, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014). In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express

Corp., 775 F.3d 448, 451-52 (1st Cir. 2014). See generally
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**Background**

Defendant Exeter Health Resources, Inc. ("Exeter Health") is the parent corporation of Exeter Hospital, Inc., in Exeter, New Hampshire. Defendant Core Physicians, LLC ("Core") is an organization that employs the hospitalists who work at Exeter Hospital. And, finally, defendant Barton & Associates ("Barton") is an organization that provides locum tenens physicians to various organizations around the country, including Core.[1]

In 2016, Dr. Obi signed a "Client Services Agreement" with Barton (document no. 46-4). Approximately one year later, Barton contracted with Core to provide Core with locum tenens healthcare providers, on an "as needed" basis. See Group Locum Tenens Agreement (document no. 45-1). Later that year, Barton assigned Dr. Obi to a placement as a locum tenens physician at Exeter Hospital, for a period of nine days, beginning on

---

[1] In Latin, "locum tenens" means "place holder" or "to hold the place of." A locum tenens physician is typically hired on a temporary basis, to fill in for a regular physician who is absent, or in situations where a medical practice is short-staffed.

3

December 24, 2017.  See Placement Order (document no. 46-5).[2]
Core did not enter into any contractual relationship with Dr.
Obi, nor did it pay her directly for her services.  See
Affidavit of Debra Cresta, President of Core Physicians, LLC
(document no. 45-8) at para. 7.  Rather, pursuant to its
agreement with Barton, Core was obligated to pay Barton $320 per
hour of services provided by Dr. Obi (with a slightly higher
hourly rate of compensation for December 25 and January 1).
Barton, in turn, would compensate Dr. Obi, pursuant to their
separate contractual agreement.

To facilitate Dr. Obi's work at the hospital, Exeter
Hospital granted her temporary medical staff membership and
privileges to practice at the hospital.  In exchange, Dr. Obi
signed an "Applicant's Consent and Release" (document no. 45-3).
During Dr. Obi's nine days at Exeter Hospital, the hospital
received a number of complaints about her from staff, patients,
and patients' family members.  In short, those complaints
centered around two general categories of concerns: Dr. Obi's
odd personal behavior and her unprofessional clinical practices.

---

[2] Prior to her beginning work at Exeter Hospital, Dr. Obi's temporary assignment there was augmented to include additional days in January and February of 2018.  See Placement Order (document no. 46-6).  However, Exeter Hospital suspended her privileges before she had an opportunity to work on any of those days.

Following a preliminary investigation into those reports, Exeter Hospital revoked Dr. Obi's temporary privileges. And, by letter to Dr. Obi dated February 9, 2018, the President of Exeter Hospital Medical Staff summarized the complaints against Dr. Obi, reaffirmed the suspension of her temporary privileges, and informed her of the various due process rights available to her. Dr. Obi was also told that, as required by federal law, Exeter Hospital would have to file a report with the National Practitioner Databank indicating that her clinical privileges had been suspended. See Letter from Rick Hollister, MD (document no. 45-4). See generally 45 C.F.R. § 60.12 ("Each health care entity must report to the NPDB and provide a copy of the report to the Board of Medical Examiners in the state in which the health care entity is located the following actions: (i) Any professional review action that adversely affects the clinical privileges of a physician or dentist for a period longer than 30 days, . . ..") (emphasis supplied).

Dr. Hollister's letter recounts a series of troubling interactions that, according to a variety of sources, Dr. Obi had with patients (e.g., praying over patients without their consent, telling patients that dementia is caused by spirits inhabiting a person's body, recruiting patients to adopt her church/religious beliefs). It also states that, following an

5

extensive review of Dr. Obi's work, her "documentation practices" revealed a "widespread lack of contemporaneous [treatment] notes" that impeded proper patient care and, in one case, may have contributed to a patient's death.

Dr. Obi acknowledges the "lapse in [her] progress notes," but blames those lapses on having been over-worked by the hospital. And, while she admits praying with various patients, Dr. Obi generally denies the substance (but not the existence of) the troubling reports made by staff, patients, and patients' family members. See Affidavit of Loretta Obi, MD (document no. 47-1), at para. 6. She claims some people were coerced into making those (allegedly false) reports, while other reports were made by individuals with racial biases against her, personal grudges, or an interest in concealing the "secrets" about Exeter Hospital that she had discovered (and was, at least in part, exposing on various social media platforms):

> Revoking my license was retaliation because of the secret information I discovered through research and personal experiences, and for also publicly exposing them at Exeter Hospital and social media platforms.
>
> The truth of this matter is that only people with something to hide, evil minds, evil intents, evil deeds would make up and use allegations especially the behavioral concerns to deny another being of her ability to survive and provide for her children because those poses [sic] no threat to anyone. Most were fabricated to distract from the real health

6

> issues that the medical community at large have overlooked because they created them to keep humanity sick, subjugated and dependent. **Most of the allegations are smoking mirrors to cover up the real issues, the real health risks that I was very vocal about during my time spent at Exeter Hospital. I was kicked out of Exeter hospital out of fear and to protect their interests because of the SECRETS that I knew and was exposing which must have also been caught in their internal electronic incident reporting system but never mentioned in the allegations. Why didn't Exeter hospital report to NPDB that I made these statements if they were false? Think for yourself!**

Affidavit of Loretta Obi, MD, at paras. 9-10 (emphasis in original). Dr. Obi describes the "secrets" that she uncovered at Exeter Hospital as "crimes against humanity." Id. at paras. 4 and 12. They are listed at length in her affidavit and they are documented, at least to some extent, in videos Dr. Obi posted to YouTube that apparently show various interactions she had with patients and staff members.[3]

Following the suspension of her clinical privileges, Dr. Obi was given notice of that action and an opportunity to

---

[3] According to Exeter, Dr. Obi is the "subject of an ongoing criminal investigation arising from her alleged video recording of patients and staff members at Exeter Hospital, without their knowledge or consent and posting the videos on the internet. In one video, the Plaintiff secretly recorded a conversation with a nurse in which they discuss a patient's confidential health information and in another, the Plaintiff secretly recorded herself praying with a patient in the emergency department." Defendants' Memorandum (document no. 28-1) at 6-7. Exeter says those videos may have violated federal HIPPA regulations and/or New Hampshire wiretapping laws.

7

respond.  She elected not to participate in the process.  Exeter Hospital filed a report with the National Practitioner Databank ("NPDB"), notifying it of the decision to suspend Dr. Obi's temporary privileges on grounds that she posed an immediate threat to health or safety, committed errors in prescribing or dispensing medications, made inappropriate and unprofessional comments to patients, and failed to maintain adequate patient records.  See NPDB Report (document no. 28-6).  The NPDB, in turn, reported Dr. Obi to the New Hampshire Board of Medicine.

The Board of Medicine then contacted Dr. Obi, but she failed to respond to the Board's request for a written explanation of the conduct described in the NPDB report.  She then refused to attend the Board's hearing in her case, writing that she had "chosen to dismiss the Board's service as a representative" and indicating that the Board "has no consent to write statutes over her."  Order Revoking License (document no. 28-7) (quoting Dr. Obi's letter).[4]  Nevertheless, a hearing was held in her absence, at which two investigators for the Board

---

[4]  Although it is not entirely clear whether Dr. Obi views herself as a "sovereign citizen," she does employ many of the arguments, references to the Uniform Commercial Code, and the linguistic and punctuation patterns common to members of that movement.  See, e.g., Handwritten notes on Order Revoking License (document no. 28-7).  See also, Complaint (document no. 2) at 11 of 63.

8

testified.  Both investigators testified in a manner consistent with the information provided by Exeter Hospital in its report to NPDB.  See Id.  On October 4, 2018, the Board suspended Dr. Obi's license to practice medicine and write prescriptions in New Hampshire.  Id.

Meanwhile, Core contacted Barton (the company that originally provided Dr. Obi as a locum tenens physician) and formally cancelled Dr. Obi's placement at Exeter Hospital.  It also notified Barton of its intention not to assign Dr. Obi to any future placements at Exeter Hospital.  See Cancellation Letter (document no. 47-7).  About four months later, Dr. Obi initiated this litigation.

**Discussion**

As construed by the magistrate judge, see Report and Recommendation (document no. 14), Dr. Obi's complaint advances three common law claims against Exeter Health: breach of contract, intentional interference with contractual relations, and defamation.[5]  As to the remaining two defendants - Core and Barton - Dr. Obi advances a single breach of contract claim.

---

[5]    As noted above, Exeter Health is the parent corporation of Exeter Hospital.  It is not a provider of health care services, nor did it extend (or revoke) Dr. Obi's medical privileges, nor did it employ her as a locum tenens physician.  Dr. Obi's claims

9

I.  <u>Barton & Associates, Inc.</u>

Dr. Obi executed a "Client Services Agreements" with Barton in September of 2016. <u>See</u> Client Services Agreement (document no. 46-4).[6] That contract contains a mandatory choice of forum clause:

> This Agreement and all [Placement Orders] shall be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts without giving effect to any choice- or conflict-of-law provision or rule that would cause the application of laws of any jurisdiction other than Massachusetts. Any suit, action, or proceeding arising from this Agreement <u>shall exclusively be instituted in</u> the courts of the United States or the Commonwealth of Massachusetts in each case located in Suffolk County, and each party irrevocably submits to the personal jurisdiction of such courts in any such suit, action, or proceeding.

Client Services Agreement at para. 13.4 (emphasis supplied). Dr. Obi does not contest the enforceability of those provisions. <u>See generally</u> <u>Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas</u>, 571 U.S. 49, 67 (2013) ("As the party acting in violation of the forum-selection clause, [plaintiff] must bear

---

appear to be against Exeter Hospital, which she has not named as a defendant. Nevertheless, Exeter Hospital is obviously aware of Dr. Obi's claims and Exeter Health has offered a defense on its behalf. As the parties accept the actual defendant to be Exeter Hospital, the court will as well.

6   In December of 2017, that agreement was modified, at Dr. Obi's request, to change the contracting entity from "Loretta Obi" to her new legal entity, "Obimedicalpc." The terms of the amended contract remained the same.

the burden of showing that public-interest factors overwhelmingly disfavor a transfer."); Carter's of New Bedford, Inc. v. Nike, Inc., 790 F.3d 289, 292 (1st Cir. 2015) ("The burden of proof is on the party opposing the enforcement of the forum selection clause."). Although Dr. Obi does make a somewhat vague claim that Barton and/or Core "forged" her signature to the Placement Order, see Complaint (document no. 2) at 8 of 63 (referencing her "Placement Order" at page 16 of 63), that assertion is wholly unsupported by the record (which satisfactorily demonstrates that Dr. Obi reviewed and signed all relevant documents through her account with DocuSign). And, perhaps more importantly, Dr. Obi does not challenge the authenticity of her signature to the overarching "Client Services Agreement."

In light of the foregoing, and for the reasons set forth in Barton's memorandum of law (document no. 46), it is plain that the contract between Dr. Obi and Barton requires Dr. Obi to file any litigation against Barton exclusively in the Commonwealth of Massachusetts. Accordingly, Dr. Obi's breach of contract claim against Barton is dismissed, without prejudice. Because Dr. Obi's complaint does not allege contract damages that plausibly meet the $75,000 amount-in-controversy requirement imposed by 28 U.S.C. § 1332(a), the court declines to transfer Dr. Obi's

claims to the United States District Court for the District of Massachusetts. See Complaint, at 20 of 63 (alleging that Barton owes Dr. Obi $22,347.20 in unpaid wages).

II. Core Physicians, LLC

Next, Dr. Obi alleges that Core breached its contract with her. See generally Report and Recommendation (document no. 14) at 6. The problem with that claim is this: Dr. Obi had no contractual relationship with Core. Core merely acted as the intermediary between Barton (the provider of locum tenens physicians, with whom Obi did have a contract) and Exeter Hospital; Core did not contract directly with Dr. Obi but, instead, facilitated Barton's placement of Dr. Obi at Exeter Hospital. In legal parlance, Dr. Obi lacks contractual privity with Core. Absent contractual privity, Dr. Obi cannot pursue a breach of contract claim against Core. See generally Surge Res., Inc. v. The Barrow Grp., 2003 DNH 041, 2003 WL 1193012, at *2 (D.N.H. Mar. 12, 2003); Gross v. Shep Brown's Boat Basin, 2000 DNG 049, 2000 WL 1480373, at *1 (D.N.H. Feb. 28, 2000).[7]

---

[7] Dr. Obi does not claim that she is an intended third-party beneficiary of the various contracts between the defendants or that she has standing to sue for any alleged breach of those contracts. See generally Arlington Tr. Co. v. Estate of Wood, 123 N.H. 765, 767 (1983).

12

Moreover, even if there had been a contract between Dr. Obi and Core, Dr. Obi has failed to point to any conduct on the part of Core that would constitute a breach (nor, of course, has she pointed to the specific contract provision that was breached). Core's decision to contact Barton and "exercise[e] its right to cancel [Dr. Obi's] placement for provider breach" was entirely consistent with its agreement with Barton. See Letter dated January 26, 2018 (document no. 45-7); see also Contract between Barton and Core, "Group Locum Tenens Agreement," (document no. 45-1) at Article V ("Cancellation & Termination"). Core is, then, entitled to judgment as a matter of law on Dr. Obi's breach of contract claim.

III. Exeter Health Resources, Inc.

Finally, as noted above, Dr. Obi brings three common law claims against Exeter Health (or, more accurately, Exeter Hospital): breach of contract, tortious (intentional) interference with contract, and defamation. None can survive summary judgment.

First, Exeter Hospital is contractually immune from each of Dr. Obi's claims. See Applicant's Consent and Release (document no. 45-3) at 3. That release is comprehensive and provides, in part, as follows:

13

> I agree that, by applying for appointment and clinical privileges, I accept the conditions below regardless of whether or not I am granted appointment or privileges, and I agree to be legally bound by those conditions, which shall remain in effect for the duration of any term of appointment I may be granted.
>
> Pursuant to New Hampshire RSA 507:8-c and any and all other pertinent state and federal law, I shall extend absolute immunity to, and release from any and all liability, and agree not to sue Exeter Hospital, its Medical Staff, and/or any other authorized representatives acting by and/or for the Hospital or its Medical Staff, and/or any third parties working in good faith in conjunction with them for any actions, recommendations, reports, statements communications, or disclosures involving me, which are made, taken, or received in conjunction with them relating, but not limited to, the following . . .

Applicant's Consent and Release at 3.[8] The non-exhaustive list of circumstances to which the release applies includes: "proceedings for suspension or reduction of clinical privileges or for denial or revocation of appointment, or any other disciplinary action;" "precautionary and/or summary suspensions;" "matters or inquiries concerning professional qualifications, credentials, clinical competence, character, mental or emotional stability, physical condition, ethics, or behavior;" and "any other matter that might directly or indirectly have an effect on my competence, on patient care, or

---

[8] As a third party working in conjunction with Exeter Hospital (to provide locum tenens physicians), Core is likely covered by the terms of that release as well.

on the orderly operation of Exeter Hospital or any other hospital or health care facility." Id.

In her affidavit, Dr. Obi testifies that she "does not recall ever signing any 'Applicant's Consent and Release' agreement," and half-heartedly argues that even if she did, it should not be enforced against her because it was "not acknowledged with a second party's autograph on the same document." Affidavit of Dr. Loretta Obi (document no. 47) at 2, para. 9. She also claims the release was the product of "unequal bargaining power" and "ambiguous language." Id. Her arguments do not preclude enforcement of the terms of the release.

To be sure, Dr. Obi also claims Exeter Hospital acted in "bad faith," which she says is a proper ground upon which to hold that the release is unenforceable. Id. However, her bald assertion of "bad faith" is unsupported by the record and, standing alone, is insufficient to invalidate the release. See generally Perez, 769 F.3d at 29-30; Tobin, 775 F.3d at 451-52.

Finally, even if the release did not preclude Dr. Obi from bringing her common law claims against Exeter Hospital, the record reveals that none of those claims has merit. Dr. Obi has

15

failed to identify which aspect of her contract with Exeter Hospital was breached or how the hospital's conduct amounts to a breach of contract. As for her tortious interference with contract claim, Dr. Obi has pointed to no evidence suggesting that Exeter Hospital wrongfully induced Barton (or Core) to breach its agreement with her, or that Exeter Hospital intentionally and improperly interfered with Dr. Obi's relationship with those entities. See generally Tessier v. Rockefeller, 162 N.H. 324, 337 (2011); Hughes v. N.H. Div. of Aero., 152 N.H. 30, 40-41, (2005).

And, finally, even if Dr. Obi were not barred from pursuing a defamation claim against Exeter Hospital, she has not pointed to any record evidence that might permit a rational trier-of-fact to conclude that Exeter Hospital knew the report that it submitted to the NPDB was false. Indeed, the record before the court establishes that Exeter Hospital had good reason to believe the troubling reports it had received about Dr. Obi's odd and unprofessional conduct. Moreover, as Exeter Hospital points out, its report to the NPDB - even if false - was, at a minimum, "conditionally privileged." A statement is "conditionally privileged" if "the facts, although untrue, were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds of its

truth." Chagnon v. Union Leader Corp., 103 N.H. 426, 438 (1961) (citation omitted). See also Pierson v. Hubbard, 147 N.H. 760, 763-64 (2002). To be actionable, a "conditionally privileged" statement must have been made with "actual malice." Chagnon, 103 N.H. at 438. Here, Exeter Hospital was legally required to file the report with the NPDB, see 45 C.F.R. §§ 60.5 and 60.12, and the record evidence, even viewed in the light most favorable to Dr. Obi, would not support a conclusion that Exeter Hospital made any statement in that report with actual malice.

**Conclusion**

For the foregoing reasons, as well as those set forth in defendants' legal memoranda, Exeter Health Resources, Exeter Hospital, and Core Physicians are entitled to judgment as a matter of law as to all claims advanced against them. Accordingly, their motion for summary judgment (document no. 45) is granted.

The motion for summary judgment submitted by Barton & Associates, Inc. (document no. 46) is granted to the extent it seeks dismissal, without prejudice, of Dr. Obi's breach of contract claim.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

May 16, 2019

cc: All pro se parties and counsel of record